UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

JOEY DAVIDSON                              *        CIVIL ACTION NO. 11-0636

VERSUS                                     *        MAG. JUDGE KAREN L. HAYES

WEYERHAEUSER CORPORATION          *

**MEMORANDUM RULING**

Before the court is a motion for summary judgment [doc. # 57] filed by defendant Weyerhaeuser NR Company (incorrectly named in the complaint as "Weyerhaeuser Corporation) (hereinafter, "Weyerhaeuser").  With the consent of all parties, the District Court referred the above-captioned case to the undersigned magistrate judge for the conduct of all further proceedings and the entry of judgment.  28 U.S.C. § 636(c).  For reasons assigned below, the motion for summary judgment is GRANTED, and plaintiff's remaining claims are DISMISSED, with prejudice.

**Procedural History**

On April 21, 2011, Joey Davidson filed the instant complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, against his former employer, Weyerhaeuser.  Davidson alleged that Weyerhaeuser unlawfully discriminated against him on the bases of gender and age when, in 2009, it discharged him from his position as a human resources executive providing support for the Dodson Lumber Facility.  He seeks damages consisting of lost wages, front and back pay; emotional distress; humiliation; pain and suffering; loss of benefits; attorney fees; court costs;

and punitive damages.

On November 1, 2011, Weyerhaeuser filed a motion for partial summary judgment seeking dismissal of plaintiff's gender discrimination claim because of his failure to exhaust administrative remedies before filing suit.  Plaintiff did not file an opposition to the motion. Accordingly, on June 4, 2012, the District Court granted Weyerhaeuser's motion for partial summary judgment, and entered judgment dismissing plaintiff's Title VII gender discrimination claim.  (Mem. Ruling and Judgment [doc. #s 42 & 43]).

On September 13, 2012, Weyerhaeuser filed the instant motion for summary judgment seeking dismissal of plaintiff's remaining claim(s) under the ADEA.  Plaintiff filed his opposition to the motion on September 25, 2012.  Weyerhaeuser filed its reply memorandum on October 2, 2012.  The matter is now before the court.

<u>**Summary Judgment Standard**</u>

Summary judgment is appropriate when the evidence before the Court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving

party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-323. The non-moving party may not merely rely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence. *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Little, supra* (citation omitted) (emphasis in original). In other words, summary judgment is warranted if no reasonable juror could return a verdict in favor of the non-movant.

3

**Uncontested Relevant Facts**

As required by Local Rule 56.1, Weyerhaeuser marshaled its evidence into a statement of material facts that it represents are not genuinely disputed.  Thus, it was incumbent on plaintiff to submit a countervailing statement of material facts that present a genuine issue for trial.  LR 56.2.  Although plaintiff filed a "Statement [of] Facts in Dispute," a significant number of the facts identified by plaintiff merely restate the same facts set forth by Weyerhaeuser.  Furthermore, the remaining facts do not controvert defendant's facts, and even accepting them as true, do not suffice to defeat defendant's motion.  Accordingly, the court will consider Weyerhaeuser's statement of facts as undisputed for purposes of the instant motion.  Fed.R.Civ.P. 56(e)(2) & (3); LR 56.2.  Weyerhaeuser's statement of facts are substantially incorporated herein and reproduced below.[1]  The court also substantially adopts plaintiff's statement of facts and intersperses them with defendant's facts below.  Finally, the court includes facts of its own.[2]

a)      Weyerhaeuser Background Facts

1.      Weyerhaeuser is a forest-products company principally engaged in the growing and harvesting of trees, but it is also engaged in the manufacturing of wood products.  (August 20, 2010 Letter from Rachel Drake to the EEOC; Def. Exh. 12).

2.      In February 2002, Weyerhaeuser acquired Willamette Industries where Davidson had been employed since August 1, 1997.  (Janice Adams Depo.; Def. Exh. 3, p. 16; Pl. Exh. 4).

3.      Weyerhaeuser's Wood Products Division, which was known as the iLevel Division at the time of Davidson's termination in September 2009, operates various types of manufacturing facilities or mills throughout the United States and

---

[1]  The court omitted some facts that were irrelevant or not supported by the cited evidence.

[2]  Plaintiff's facts include the prefix "P," followed by the number.  The court's findings are denoted as "Ct."

4

Canada.  (Peter Corak Declaration; Def. Exh. 1; *see also* Cheryl Bourn Decl., Def. Suppl. Exh.).[3]

4.  When Davidson was terminated in September 2009, the iLevel division included business units known as Engineered Wood Products ("EWP") and Lumber, which are greatly dependent on new home construction and the housing market; EWP also included other units.  *Id*.

5.  Each iLevel mill is supported by at least one human resources professional, who is typically called a human resources manager and generally supports more than one facility.  *Id*.

6.  Within Weyerhaeuser, regional human resources managers report to human resources directors.  *Id*.

7.  In late 2008, Weyerhaeuser started to consolidate its human resources teams supporting two iLevel units - Strand and Veneer Technologies, which were thereafter called the Engineered Wood Products unit ("EWP").  *Id*.; Adams Depo., pgs. 19-20; Def. Exh. 3.

8.  This consolidation occurred operationally within Human Resources in 2008, but continued into 2009 and 2010 on the business side within the mills and upper management.  (Adams Depo., pgs. 19-23; Def. Exh. 3).

9.  Lumber, another iLevel business, maintained its autonomy within the iLevel organization, and together with EWP and other units, comprised Weyerhaeuser's iLevel Division.  (Corak/Bourn Decl.'s, Def. Exh. 1, Suppl. Exh.; Adams Depo., pgs. 19-23, Def. Exh. 3).

10.  As part of this 18-month consolidation and reorganization, Weyerhaeuser reduced the number of Human Resources Director positions from ten to four.  *Id*.

b)      Plaintiff's Background

---

[3]  Plaintiff contends that the court cannot rely on John Corak's declaration because Weyerhaeuser failed to disclose him as a potential witness.  However, the substance of Corak's declaration generally relates to Weyerhaeuser's business structure and the overall reductions in force that the company underwent over the past few years.  Furthermore, Weyerhaeuser remedied this technical objection by supplementing the record to include a declaration by Cheryl Bourn, in which she vouched for the statements in Corak's declaration.  *See* Bourn Decl.; Def. Reply Memo., Exh.  Accordingly, plaintiff's objection is overruled.

11.     Davidson was born in March 1954.  (Drake Letter; Def. Exh. 12).  Thus, he  was older than Dawn Leatherwood and Billy Benefield.  (P23).

P1.     Davidson received bachelor and master's degrees in Education from Louisiana Tech University.  (Pl. Depo., pgs. 20-26; Pl. Exh. 1).

Ct.     Davidson taught briefly at area high schools before commencing a 17 year career with the  Lincoln Parish Sheriff.  *Id*., pgs. 24-27.  Davidson spent several of those years as an administrative assistant.  *Id*., pgs. 28-29.

P4-5.   In 1997, Davidson left the Sheriff's office and went to work as a safety manager at Willamette Industries.  *Id*., pgs. 28-30.  After two years, Davidson was promoted to  a regional Human Resources Manager position, where he oversaw approximately 1,500 employees.  *Id*.; *see also* P13.

12.     Following Weyerhaeuser's acquisition of Willamette in February 2002,[4] Davidson became a regional human resources manager who supervised human resources functions and mill-based managers at mills located in Dodson, Emerson, Zwolle, Simsboro, Malvern, Taylor, and Arcadia, which were part of the iLevel division. (Davidson Depo., pgs. 53, 58; Pl. Exh. 1).

P10.    Davidson reported to Janice Adams from 2005 until 2008 when Adams assumed Davidson's position.  (Davidson Depo., pgs. 161-181).

14.     Davidson worked for Weyerhaeuser from February 2002 until his discharge in September 2009.  (Davidson Depo., pg. 100; *see also* Def. Exh. 12 and P20).

c)      <u>Dawn Leatherwood Background Facts</u>

15.     Dawn Leatherwood was born in February 1961.  (Drake Letter; Def. Exh. 12).

P3.     Leatherwood completed about two years of college, but did not obtain a degree. (Leatherwood Depo., pgs. 13-14).

16.     Leatherwood began her employment with Willamette Industries in October 1996 as an administrative assistant to several Willamette regional human resources managers.  (Leatherwood Depo., pgs. 22-24, Pl. Exh. 2; Pl. Depo., pgs. 86-87).[5]

18.     Leatherwood became a Weyerhaeuser employee in 2002 when Weyerhaeuser

---

[4]  Also set forth in P6.

[5]  *See also* P7.

6

acquired Willamette.  (Leatherwood Depo., pgs. 22-24).

19.     In 2002, Davidson offered Leatherwood a position on his team.  *Id*., pg. 27.
        Davidson was Leatherwood's immediate supervisor, and remained in that capacity
        until 2008.  *Id*., pgs. 28, 36.[6]

20.     In 2006-2007, Davidson promoted Leatherwood to Human Resources Manager.
        (Davidson Depo., pgs. 92-93).[7]

P9.     As Leatherwood made the transition to human resources, Davidson took her
        around to plant management; consulted with her; completed training reports with
        her; occasionally went over some things with her; and remained available for any
        calls or questions that she had.  (Davidson Depo., pgs. 362-363).

d)     Billy Benefield, Jr. Background Facts

22.     Billy Benefield, Jr. was born in January 1959.  (Drake Letter; Def. Exh. 12).

P2.     Benefield obtained a bachelor of science degree in Industrial Engineering.
        (Benefield Depo., pgs.7-8; Pl. Exh. 3).  He did not obtain a graduate degree,
        however.  *Id*.

23.     On March 17, 1985, Benefield began his career with TrusJoist Corporation as a
        quality assistance technician at what is now the Weyerhaeuser Natchitoches mill.
        (Benefield Depo., pgs. 11-13).

24.     Benefield became TrusJoist's safety director in 1987; in 1989, he also assumed
        the position of purchasing agent.  *Id*., pgs. 14-15.

25.     In 1994, Benefield became the human resources manager for the Natchitoches
        mill.  *Id*., pg. 17.

26.     When Weyerhaeuser acquired TrusJoist in 1999 or 2000, Benefield chose to
        remain in human resources at the Natchitoches facility.  *Id*., pg. 21.

27.     Benefield also eventually became the human resources manager for the
        Weyerhaeuser mill in Zwolle, in addition to his duties at the Natchitoches mill.
        (Davidson Depo., pg. 117).

---

[6]  *See also* P11.

[7]  *See also* P8.

7

P11    Davidson supervised Benefield during his tenure as regional human resources manager (at least until the 2008 realignment).  *See* Davidson Depo., pg. 257.

e)    <u>Janice Adams Background Facts</u>

Ct.    Janice Adams was born in July 1956.  (Adams Depo., pgs. 24-25; Pl. Exh. 4).

28.    In August 2005, Adams became a Human Resources Director with the Veneer Technologies group of Weyerhaeuser; Veneer Technologies was a business unit within iLevel.  (Adams Depo., pgs. 17-18; Pl. Exh. 4).

29.    As a Human Resources Director, Adams was responsible for overseeing the human resources function of Veneer Technologies, which included the supervision of three regional human resources managers, including Davidson.  *Id.*, pgs. 17-18.

30.    For several years while he was a regional human resources manager, Davidson reported to Adams.  (Davidson Depo., pgs. 98-99).

P15    Adams always gave Davidson satisfactory review, even gave him a "high achieves" score on his last performance review that she completed in 2009.  (Pl. Exh. 5).

31.    Janice Adams was longer-tenured in human resources and had greater seniority than Davidson.  (Davidson Depo., pg. 165).

32.    In 2008, the number of human resources directors was reduced from ten to four.  (Adams Depo., pg. 23).  Adams' position as a human resources director was eliminated as part of this consolidation. *Id.*, pg. 24.  As a result, she assumed a newly consolidated regional human resources manager role for the eastern United States.  *Id.*[8]

33.    Three regional human resources managers' positions were merged into one.  *Id.*

35.    In connection with the consolidation, Weyerhaeuser offered mill-based human resources manager roles to Davidson and the two other regional managers displaced by the reorganization.  Davidson and Lesley O'Dwyer accepted the mill-based roles; the third regional human resources manager declined,  and instead accepted termination, plus a severance package.  *Id.*, pgs. 26-27.

---

[8]  Plaintiff contends that Adams displaced him as area human resources manager because she wanted to move back home.  (P12; Davidson Depo., pgs. 161-162).  Davidson conceded, however, that he really did not know what happened to Adams' former position.  *Id.*

36.     Following this initial human resources reorganization, which became effective in October 1, 2008, seven human resource managers reported directly to Janice Adams in her new role as a regional human resources manager:  Davidson, Dawn Leatherwood, Billy Benefield, Leslie O'Dwyer, Hank Goldberg, Bill Underwood and Caroline Sarblah.  *Id*., pgs. 27, 37.

37.     Prior to this reorganization, Davidson had been Dawn Leatherwood and Billy Benefield's direct supervisor.  *Id*., pg. 29.

Ct.     Davidson accepted his new position, but he did not like it.  (Davidson Depo., pgs. 164-165).  He preferred to be a regional manager.  *Id*.

f)   <u>Impact of the Declines in New Home Construction and the Housing Market</u>

38.     The drastic downturn in the United States' housing market over the past several years compelled Weyerhaeuser to significantly reduce its operations nationwide through the closure of multiple facilities, reductions-in-force at operating mills, and the divestiture of two significant divisions:  Fine Paper in 2007 and Containerboard Packaging & Recycling in 2008.  (Peter Corak Declaration; Def. Exh. 1; *see also* Cheryl Bourn Decl., Def. Suppl. Exh.).

39.     Between 2008 and 2010, Weyerhaeuser's iLevel division drastically reduced the number of human resources directors, regional human resources managers – as well as the overall number of employees and even executives - because the iLevel business had dramatically declined due to the depressed economy and the housing market collapse.  *Id*.

40.     An unprecedented decline in the housing market caused substantial decreases in production, which required Weyerhaeuser to close iLevel facilities, reduce and consolidate iLevel production, and implement significant reductions in force in the iLevel division.  *Id*.

41.     The United States and Canadian iLevel employee population declined from 16,189 at the end of December 2005 to 6,039 as of December 15, 2011, an overall reduction of sixty-four percent.  *Id*.

42.     There were 57 human resources professionals within the U.S. and Canadian iLevel operations as of December 2006.  *Id*.

43     By January 2010, the iLevel human resources personnel had been reduced to 28.  *Id*.

44.     Davidson testified that he thought there was a slump in the housing business in 2007 or 2008 and that overall Weyerhaeuser was having trouble with its business

volume because production went down when orders declined.  (Davidson Depo., pgs. 12 & 126).

45.    Davidson testified that Weyerhaeuser was making reductions in force at mills and also closing mills.  *Id*., pgs. 128-130, 147, 149 & 229.

P26.    Davidson thought that Weyerhaeuser was reducing its manufacturing assets so it could convert to an REIT.  (Davidson Depo., pgs. 233-235).

g)    Plaintiff's Transfer to EWP Human Resources Manager

46.    In October 2008, Davidson was reassigned from regional human resources manager to a mill-based EWP human resources manager over mills located in Arcadia and Simsboro; Davidson continued to report to Adams in her new role. (Davidson Depo., pgs. 74, 98-99, 101-103 & 160-165).[9]

48.    In his new mill-based human resources role, Davidson was to provide human resources support to the Arcadia and Simsboro, Louisiana, facilities.  *Id*., pg. 27.

47.    Following the reorganization, Davidson, Leatherwood, and Benefield became peers as mill-based human resources managers.  (Adams Depo., pg. 30).

49.    Neither Davidson, nor another former regional human resources manager, O'Dwyer, had their compensation reduced as a result of these changes.  *Id*., pg. 39; Davidson Depo., pg. 176.

h)    Elimination of Plaintiff's Position as EWP Human Resources Manager

50.    After the October 2008 reorganization, Weyerhaeuser continued to experience the effects of the significant housing market collapse.  (Peter Corak Declaration; Def. Exh. 1; *see also* Cheryl Bourn Decl., Def. Suppl. Exh.).

51.    Between the Fall of 2008 and the Spring of 2009, iLevel closed or indefinitely curtailed and closed nine facilities in the eastern United States.  (Drake Letter; Def. Exh. 12).

52.    Consequently, in April 2009, Weyerhaeuser announced yet another reorganization and reduction-in-force of the EWP human resources team.  As a result, Adams had to reduce her team from seven human resource managers to four. (Adams Depo., pg. 37).

---

[9]  *See also* P13.

10

53. One of Adams' team eliminations was Caroline Sarblah, who was not willing to relocate even though her facility had recently closed; Sarblah told Adams that she did not want to assume responsibility for multiple iLevel facilities. (Adams Depo., pg. 50).

54. Facing potential job elimination, Hank Goldberg decided that he would retire later that year. *Id*.

55. Sarblah and Goldberg's departure meant that Adams had to select one more position for elimination from the remaining five human resource managers. *Id*., pg. 57.

56. Adams contacted iLevel's regional and local mill managers, as well as Regional Human Resources Manager J.R. Roth, for feedback regarding the individual job performance of Adams' team members. *Id*., pg. 40.

57. Adams utilized the written competency feedback forms, similar to what she used during her annual and mid-year performance reviews, as one tool for evaluating how she was going to reduce her team. In addition to these forms, Adams also utilized each human resource manager's performance evaluations ("PGMs") from the prior two years, her own knowledge regarding her teams' respective workload and experience, and direct feedback from site leaders regarding the support they were receiving from their current human resource managers. *Id*., pg. 49.

58. Adams created a spreadsheet which combined each of the remaining six managers' PGM ratings for the prior two years and their average competency feedback form scores to reach an overall rating. *Id*., pgs. 50-52; and Spreadsheet, Pl. Exh. 9.

P25. For 2007 and 2008, Davidson's annual performance ratings were one point higher than Benefield's ratings. (Pl. Exh. 9).

Ct. Conversely, Benefield's Employee Advocate Rating and Administrative Skills scores were significantly higher than Davidson's. *Id*. Moreover, Davidson's overall rating was less than two tenths of a point higher than Benefield's. *Id*. The next lowest overall score was nearly two points higher than Davidson's. *Id*. Leatherwood's overall rating was more than three points higher than Davidson's. *Id*.

59. During this period, several mills closed, so Adams also looked at the closed mills and who supported those mills as part of her evaluation. *Id*., pg. 55.

60. Adams also considered continuity of human resources support and geography in her analysis. *Id*.

11

61.     Adams received written responses from mill managers regarding Davidson's job performance, and also some verbal feedback while visiting with mill leaders. Adams recalled that two mill managers, Johnny Carter and Steve Story, reported to Adams that they did not want Davidson to support their mills because Davidson did not add value.  *Id*., pgs. 42-43.

65.     Because Janice Adams was aware of a possible vacancy in Lumber stemming from the retirement of Janice Alexander, Adams asked JR Roth whether she would consider filling Alexander's position at the Dodson Lumber facility with Davidson.  *Id*., pg. 60; Roth Depo., pg. 7; Pl. Exh. 8.[10]

P18.    Adams could not transfer Benefield to the Lumber Division, because, outside of the mills where Benefield actually worked,[11] he was perceived as not being the strongest human resources manager.  (Adams Depo., pg. 59).  Adams, however, felt otherwise.  *Id*.  She believed that Benefield was a solid human resources manager.  *Id*.

P17.    Adams' boss, Allen Bradshaw, told Adams that if she felt strongly enough that Benefield was good enough to stay with Weyerhaeuser as a human resources manager, then Adams needed to take responsibility for changing that perception about him outside of those facilities.  *Id*., pg. 60.

P19.    Adams and Bradshaw had told Davidson that if a human resources professional needed to "be let go," it would be Benefield.  (Davidson Depo., pg. 288).

67.     Janice Adams explained to Roth that Davidson had been in a regional role with EWP.  (Roth Depo., pg. 11; Pl. Exh. 8).

Ct.     Adams told Roth that Davidson previously had worked in a regional capacity. (Roth Depo., pg. 11).  Roth cautioned Adams that the position at Lumber would be considerably different than a regional role.  *Id*.

Ct.     Roth knew that Davidson had some question marks regarding his ability to manage and administer the day-to-day work required at the facility-level, because

---

[10]  JR Roth was a regional human resources manager for the Lumber unit.  Furthermore, while the EWP and Lumber units were part of Weyerhaeuser's iLevel division, each unit had a separate human resources management structure.  (Ex. 1, ¶ 22; Ex. 2, pp. 184-186; and, Ex. 3, pp. 58-59).

[11]  Mill managers, Steve Story and Debbie Tadlock, were very strong supporters of Benefield.  *Id*.

he had previous experience at a higher position.  *Id*., pg. 10.

69.     Roth also had received feedback that Davidson was not tactically or administratively strong.  *Id*., pg. 11.  While Adams acknowledged that this was a concern, she assured Roth that Davidson remained committed.  *Id*.

70.     Despite Roth's concerns about Davidson, she agreed to accept his transfer to the human resources manager position for the Lumber facilities in Taylor and Dodson, Louisiana, effective May 18, 2009.  *See* Davidson Depo., pgs. 172-174, 176 & 183-184; Adams Depo., pgs. 56-57; and, Roth Depo., pgs. 7, 15-18 & 37-38; and Cheryl Bourn Depo., pg. 33; Pl. Exh. 6).[12]

71.     Roth became Davidson's direct supervisor, and his salary grade was reduced from Grade 42 to 40, a $14,000 pay-cut. (Adams Depo., pgs. 62-63; Roth Depo., pg. 6 ; Bourn Depo., pg. 29).

73.     Davidson did not recall previously working with Roth. (Davidson Depo., pg. 187).

74.     Upon Davidson's transfer to the Lumber division, Roth instructed him to contact David West and Ben Freelon, the managers of the Dodson and Taylor mills where Davidson would be providing human resources support. (Roth Depo., pgs. 14,18-20).

76.     After Davidson's meeting with West and Freelon, Roth solicited feedback from them about Davidson.  *Id*.

77.     Both West and Freelon indicated to Roth their willingness to work with Davidson. However, because of the perception that Davidson wanted to work in a higher level position, Freelon was concerned about how well Davidson would work in a lower level position.  *Id*.

78.     Carl Chapman, the Area Operations Manager for Lumber facilities that included the Dodson and Taylor mills, also expressed some reservations to Roth about Davidson's acceptance of the Lumber position.  *Id*.

79.     Chapman told Roth that because EWP had not wanted Davidson, he thought it would be difficult for Davidson to meet the day-to-day administrative requirements of his new position.  *Id*.

80.     Chapman wondered out loud to Roth why Lumber should accept Davidson when EWP had decided not to retain him.  *Id*.

---

[12]  *See* also P16.

13

81.     Before she left Weyerhaeuser, Janice Alexander – the retiring human resources professional whom Davidson replaced at the  Dodson mill – spent two weeks with Davidson helping him to transition to his new position.  *Id*., pgs. 15-17.

82.     Alexander expressed concerns to Roth about Davidson's ability to administer the on-site, day-to-day human resources functions required at Dodson.  *Id*.

83.     Alexander also told Roth that she was concerned that the hourly associate base at Dodson would not receive the level of support that they needed from Davidson. *Id*.  Alexander was afraid that the hourly associates would not feel comfortable discussing matters with Davidson.  *Id*.

84.     Less than two months after Davidson assumed his new role with Lumber, Weyerhaeuser announced the closure of the Taylor facility.  (Davidson Depo., pg. 222).  Davidson helped support this closure.  *Id*.

85.     After the Taylor mill's closure, mill manager Ben Freelon contacted Roth to report that several hourly associates affected by the closure did not "appreciate" how Davidson had worked with them on their benefits information.  (Roth Depo., pgs. 18, 29-30).

86.     Roth testified that she provided Davidson with PeopleSoft reports from Weyerhaeuser's PeopleSoft system, the company's confidential employee software, because she believed that Davidson did not know how to access the reports himself.  *Id*., pgs. 25-26.

87.     Around the same time as the Taylor facility closure announcement, Weyerhaeuser announced shift reductions at the unionized Dodson Lumber facility that Davidson also supported.  *Id*., pgs. 24-26; Declaration of Kathy Willoughby, Def. Exh. 11.

88.     During the shift reductions, Dodson's manager, Kathy Willoughby, reported to Roth that Davidson "struggled" with the union contract bumping process at the facility, which involved the creation of spreadsheets of employee names and seniority dates in order to determine who would be laid off.  *Id*.

89      Accordingly, Willoughby asked Roth if Dawn Leatherwood could assist Davidson with the shift reductions to be implemented at Dodson.  *Id*.

90.     Because Leatherwood reported to Janice Adams and both were part of the EWP regional human resources team, Roth requested and received permission from Adams to "borrow" Leatherwood from EWP to assist with the Dodson lumber facility shift reduction. (Adams Depo., pg. 67; Roth Depo., pg. 26; and

14

Willoughby Decl.).

91.     Leatherwood successfully oversaw and completed the shift reduction at Dodson. (Roth Depo., pgs. 25-27; and Willoughby Decl.).

92.     Following the Dodson shift reduction, Kathy Willoughby told Roth that she had "appreciated all that Dawn Leatherwood had done, and that Dawn's work on the reduction in force had been outstanding. [She] also mentioned to JR Roth that [she] would like to have Dawn Leatherwood for [her] human resources support at Dodson Lumber instead of Joey Davidson."  (Willoughby Decl.).

93.     Davidson testified that Willoughby expressed her dissatisfaction with his performance.  (Davidson, pg. 210).

Ct.     Davidson believed that Willoughby was not pleased with him because he had disagreed with her about the need for an extended re-training period for an employee.  *Id.*, pgs. 210-214.

Ct.     Willoughby was born in February 1957.  (Willoughby Decl.).

P21.    Davidson worked with Willoughby but for a little more than one month before his discharge.  (Davidson Depo., pgs. 199-201).

i)      The September 2009 Reductions in Force and Reorganization

94.     On August 20, 2009, Weyerhaeuser announced a third human resources reorganization and reduction-in-force to the iLevel human resources team. Three Human Resources Director positions were consolidated into one role:  Cheryl Bourn assumed this new role as the iLevel Human Resources Director.  (Bourn Depo., pgs. 5-6; Aug. 20, 2009, email from John Hooper, Def. Exh. 16).

95.     Weyerhaeuser instructed Cheryl Bourn to reduce the iLevel human resources budget by at least $1 million.  *See* Aug. 24, 2009 email from Cheryl Bourn; Def. Exh. 17.

96.     On August 24, 2009, Bourn informed the iLevel human resources team, including Davidson, that Weyerhaeuser would finalize its iLevel human resources leadership structure by the end of the week, and that it would announce further reductions in iLevel's human resources structure by the end of September 2009. *Id.*

97.     Bourn relied on Adams and Roth to evaluate the human resources professionals – including Davidson -- within their respective regions. (Bourn Depo., pgs. 20-22, 25).

98.     On August 28, 2009, Bourn announced changes to the iLevel human resources leadership structure which would become effective October 1, 2009. (August 28, 2009, email from Cheryl Bourn; Def. Exh. 18).

99.     As a result of these changes, Adams became the Regional Human Resources Manager for South Manufacturing, and Roth became the Regional Human Resources Manager for Southeast Manufacturing.  (Bourn Depo., pgs. 6-7; and Bourn E-mail, Def. Exh. 18).  This change resulted in the elimination of two other regional human resources manager positions.  *See* Bourn E-mail, Def. Exh. 18).

100.    During this period, Roth and Adams discussed and exchanged charts describing possible scenarios for restructuring iLevel's human resources team; Roth and Adams later presented some of these options to Cheryl Bourn for her review and made various recommendations.  (Adams Depo., pg. 70; Bourn Depo., pgs. 20-23; and August 2009 emails, Def. Exh. 19).

101.    Janice Adams, Cheryl Bourn and JR Roth were the three Weyerhaeuser individuals involved with the decision-making process for the human resources reductions made in Adams and Roth's units in September 2009.  *See e.g.*, Davidson Depo., pg. 264.

102.    In September 2009, Adams and Roth were peers and both reported to Cheryl Bourn, who was the iLevel human resources director.  (Peter Corak Decl.; Cheryl Bourn Decl.; Davidson Depo., pgs. 186-187).

103.    The reductions implemented by Janice Adams and JR Roth affected, respectively, EWP and Lumber mills in the southeast United States, not just in Louisiana. (Peter Corak Declaration; Cheryl Bourn Decl., and Drake Letter).

104.    Weyerhaeuser evaluated all twelve human resources professionals within the Southeastern United States as part of its September 2009 iLevel reduction in force.  (Adams Depo., pg. 70; Aug. 2009 E-mails, Def. Exh. 19).

105.    All but two of the twelve individuals whose positions Weyerhaeuser retained were members of the ADEA protected class at the time of the reduction in force. (Drake Letter).

Ct.     Two critical factors that guided the selection process were geography and the overall performance reviews by the two leaders involved in the decision, *i.e.*, Adams and Roth.  (Bourn Depo., pgs. 17-29).  They did not consider solutions that required relocation because of the costs involved.  *Id*.

107.    Early in the process, Roth and Adams identified the positions held by Ann

16

Williams (born in 1960) and Malinda Hitt (February 1954) for elimination, as both employees' human resources support was limited to tactical work.  (Drake Letter).  Bourn approved these selections.

109.    Williams and Hitt transitioned to other non-human resources roles within Weyerhaeuser.  (Drake Letter).

110.    The other human resources positions, supporting facilities in Michigan, North Carolina, West Virginia, Mississippi, Oklahoma, Alabama, and Arkansas, were maintained, as the human resources managers in those roles would provide support to more than one facility and none of them required relocation.  *Id.*

111.    Two of the human resources managers supervised by Adams and/or Roth who survived the September 2009 purge were six or more years older than Davidson: Bob Mabry, who was born in February 1948; and Bill Underwood who was born in July 1947.  *See* Drake Letter.

114.    Debbie Burk was another human resource manager who preserved her position.  She was born in September 1955, and thus, was less than two years younger than Davidson.  *Id.*

j)    Plaintiff's Testimony Concerning Benefield and Leatherwood

115.    Billy Benefield, Jr. and Dawn Leatherwood were both experienced, qualified and competent mill-based human resources managers who had reported to Davidson when he was a regional human resources manager from 2002-2008.  (Davidson Depo., pgs. 83-86, 92-93, 257, 286-288, 340 & 362).

116.    Davidson consistently assigned Benefield and Leatherwood overall reviews of "achieves" (the other two categories were "below" and "exceeds"). (Davidson Depo., pgs. 258-60).

Ct.    Moreover, Davidson assigned mostly "High Achieves" to Leatherwood.  *Id.*

k)    The Decision to Discharge Davidson

118.    Because of the Taylor mill closure in July 2009, the iLevel human resources team for the Louisiana facilities included three full-time individuals who supported five facilities:  Dawn Leatherwood (Emerson and Arcadia); Billy Benefield (Zwolle and Natchitoches); and Davidson (Dodson).  (Drake Letter).

Ct.    Adams, Bourn, and Roth determined that in the Louisiana-Arkansas area, they needed to reduce four human resources positions (Leatherwood, Benefield, Davidson, plus Debbie Burk) to three.  (Adams Depo., pgs. 77-78).

17

121.    Adams and Roth separately consulted with the leadership at the five Louisiana facilities under their respective divisions.  that they each supported.  *See* Bourn Depo., pgs. 20-30 and Plant Manager Declarations, Def. Exhs. 8-11.

122.    Kathy Willoughby, the Dodson plant manager, told Roth and Bourn that she wanted to retain Dawn Leatherwood over Davidson to provide human resources support for that facility. (Bourn Depo., pgs. 25-28; Willoughby Decl., Def. Exh. 11).

123.    Willoughby felt that Davidson exhibited a preference for higher-level human resources responsibilities and was less willing to perform the human resources generalist tasks associated with supporting a mill like Dodson, such as working closely with Weyerhaeuser staff support software (PeopleSoft) and being able and willing to handle routine day-to-day matters at the facility-level.  *Id*.

124.    Johnny Carter of the Emerson mill told Adams that he wanted to retain Dawn Leatherwood over Joey Davidson because she "**was a much better human resources manager than Joey Davidson had been or would ever be.**" (Carter Decl., Def. Exh. 8) (emphasis added).

125.    Carter told Adams that "Dawn Leatherwood was highly organized, had great rapport with the work-force at Emerson when she provided support for that mill, was virtually always accessible or available, understood Weyerhaeuser's systems and procedures, was aware of and concerned about the key factors for operating and running the Emerson mill, was a great listener and tried to be objective, and was courteous, fair, practical and professional in her dealings with employees and issues that arose at the mill."  *Id*.

126.    Conversely, Carter told Adams that "**Joey Davidson was generally not organized or efficient, was not a good scheduler, was a poor planner, tried to play politics in his dealings with the union, tended to disregard or discount the input and views of me and other members of the mill management team on matters pertaining to dealings with mill workers and mill operations, was usually not interested in the opinions of others, was not open-minded, and did not like to get involved in details or nitty-gritty work.**"  *Id*. (emphasis added).

127.    Bourn was made aware of Johnny Carter's concerns and his preference for Dawn Leatherwood.  (Bourn Depo., pgs. 29-30).

129.    Steve Story, the Natchitoches mill manager, was aware that Dawn Leatherwood "had been consistently held in high regard by the mill managers she has supported over the years." (Story Decl., Def. Exh. 9).

130. Debbie Tadlock, the Zwolle mill manager, had personal experience working with Dawn Leatherwood, and told Janice Adams that she "had nothing but good things to say about Dawn and praised her abilities and performance." (Tadlock Decl., Def. Exh. 10).[13]

131. Bourn was aware of Story and Tadlock's views about Davidson, and their preference for Billy Benefield.  (Bourn Depo., pgs. 22-25).

133. Steve Story, the Natchitoches mill manager, "told Janice Adams that Billy Benefield, Jr. was always right there when he was needed and stayed on top of things that needed attention" and that "that Billy provided great support for the Natchitoches mill, and was always willing to go the extra mile, even if it meant working long hours."  (Story Decl., Def. Exh. 9). Story added that "without a shadow of doubt that Billy always had the company's best interests at heart" and that "it was a 'no brainer' to keep Billy on as the human resources manager for Natchitoches."  *Id.*

134. Story further told Adams that "Joey Davidson was usually not receptive to [his] views or comments from other members of the mill management team" and that "Joey was usually only interested in his own agenda."  *Id.*

135. Story also told Adams that he "**felt that Joey did what was best for Joey and only did what he wanted to do,**" that he "**did not believe that Joey would provide good support to the mill,**" and that he "**hoped that Joey would not be made the human resources for the Natchitoches mill.**"  *Id*. (emphasis added).

136. Debbie Tadlock, the Zwolle mill manager, told Janice Adams that she "definitely wanted Billy Benefield, Jr. to continue as the human resources manager for the Zwolle facility" and that Billy "was a seasoned, dedicated and valuable human

---

[13]  Plaintiff objects to the court's consideration of Tadlock's declaration because Weyerhaeuser failed to identify her as a potential witness during the discovery process. However, the substance of Tadlock's declaration already appears in the summary judgment record via Bourn's testimony that she was aware that Tadlock "strongly" preferred Billy Benefield to provide human resources support for her mill.  (Bourn Depo., pg. 25).  Furthermore, plaintiff, himself, was well aware that the preferences of the plant managers, including Tadlock, influenced the decision to terminate his employment.  (Davidson Depo., pgs. 275-276). Nonetheless, he did not take the depositions of any of the plant managers.  Moreover, he has not sought to defer consideration of the motion for summary judgment to permit him to marshal requisite facts to oppose the motion.  *See* Fed.R.Civ.P. 56(d).  In short, plaintiff has not demonstrated that he was materially prejudiced by defendant's failure to identify Tadlock as a witness.  Plaintiff's objection is overruled.

resources manager who managed to balance and serve two different mills run by two different mill managers."  (Tadlock Decl., Def. Exh. 10).

137.   Tadlock also told Adams that Davidson "**seemed to be more about show and less about work**" and that it was her impression that "**Joey would probably not be effective as a human resources manager supporting one or more mills.**"  *Id*.  (emphasis added).

138.   While a lesser consideration, compensation costs were reviewed because Bourn was tasked with making significant budget cuts - $1 million.  (Bourn Depo., pgs. 18-20).[14]

139.   Davidson was earning approximately 35% more than Leatherwood and approximately 45% more than Benefield at that time.  *Id*.[15]

140.   In September 2009, Janice Adams, JR Roth, Cheryl Bourn, Billy Benfield, Jr. and Dawn Leatherwood were all over the age of forty.  (Drake Letter).

141.   Janice Adams is about two years younger than Davidson.  *Id*.

142.   Billy Benefield, Jr. and Cheryl Bourn are about five years younger than Davidson.  *Id*.[16]

143.   JR Roth and Dawn Leatherwood are about seven years younger than Davidson.  *Id*.[17]

144.   Adams, Roth and Bourn ultimately decided to eliminate Davidson's position.  (Roth Depo., pgs. 23-24; Bourn Depo., pgs. 21-32).

145.   Based on his experience with each of them, Davidson agreed that Janice Adams, JR Roth and Cheryl Bourn were fair people.  *Id*., pgs. 267-268.[18]

146.   JR Roth, Davidson's supervisor at that time, made the decision to eliminate

---

[14]  *See also* P22.

[15]  *See also* P22.

[16]  *See also* P23.

[17]  *See also* P23.

[18]  Nonetheless, Davidson told Bourn that he thought her decision was "unfair." (Davidson Depo., pg. 246).

Davidson's position. (Adams Depo., pgs. 69, 78; Roth Depo., pg. 23; Davidson Depo., pg. 267).

148.   According to Roth, Davidson was let go because 1) they needed to make reductions in the human resources area; and 2) because of her concerns regarding Davidson's "ability to handle the administrative, tactical, day-to-day work at the Dodson facility that was required in this new HR organization."  (Roth Depo., pgs. 23-24).

Ct.   Bourn stated that the predominant factor in their decision to retain Benefield and Leatherwood over Davidson was the support of the mill managers that each worked with.  (Bourn Depo., pgs. 21-22).

Ct.   Davidson believed that Roth and Adams should not have solicited opinions about him from others.  (Davidson Depo., pg. 281).  Nonetheless, he agreed that the human resources manager at a facility should work very closely with the plant manager.  *Id*.

149.   After Davidson's discharge, Dawn Leatherwood retained the Arcadia facility and assumed responsibility for the Dodson lumber facility.  (Davidson Depo., pgs. 194-195).

150.   Debbie Burk took over responsibility for the Emerson, Louisiana facility which was in her general geographic area.  *Id*.

151.   Billy Benefield, Jr. remained with the Zwolle and Natchitoches facilities.

152.   On September 29, 2009, Kathy Willoughby notified Davidson that his position had been eliminated.  (Davidson Depo., pgs. 239-40).[19]

153.   A few days after his termination, Davidson spoke with Cheryl Bourn, who asked him whether he would be interested in other non-human resources employment with Weyerhaeuser – assuming a position were available.  (Davidson Depo., pg. 247).

Ct.   Davidson did not tell Bourn that he was not interested in a non-human resources position.  *Id*.

155.   Cheryl Bourn told Davidson that the leaders in the region wanted to retain Benefield and Leatherwood in their human resource manager roles based on an investigation performed by Janice Adams and JR Roth.  *Id*., pgs. 346-347.

---

[19]  *See also* P20.

Ct. Davidson told Bourn that he had been told that Benefield was part of the problem, and that he could not believe that they would keep somebody like Benefield over himself.  *Id*.

Ct. Davidson reminded Bourn that Steve Story was on a performance plan that Benefield was helping to oversee, and perhaps that was why Story was motivated to express a preference for Benefield.  *Id*.

Ct. Adams testified, however, that *she* and Jan Morris had implemented the performance plan for Steve Story.  (Adams Depo., pgs. 60-63).  Moreover, Dawn Leatherwood conducted the investigation of Story, not Benefield.  *Id*.

P14. Adams never received any complaints from Leatherwood or Benefield about the advice Davidson provided them as their supervisor.  (Adams Depo., pgs. 29-30).

P24. Furthermore, Davidson provided training and assistance to Benefield and Leatherwood during the time that he was their supervisor.  (Davidson Depo., pgs. 262-263, 288, 362-363).

Ct. By 2006, however, Leatherwood said that she avoided seeking advice from Davidson, and instead, sought counsel from others.  (Leatherwood Depo., pg. 50).

Ct. Leatherwood also testified that mill managers, Johnny Carter, Mark Noles, and Ron Edinger were not admirers of Davidson.  *See* Leatherwood Depo., pgs. 69-71.

Ct. Leatherwood believed that part of Davidson's problem was that he would tell the mill managers what to do.  *Id*., pg. 72.  Unit human resources managers, however, did not have that authority.  *Id*.

159. On July 16, 2010, Davidson filed a Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC") alleging age discrimination in violation of the Age Discrimination and Employment Act ("ADEA") [Doc. 25-2].

160. When the EEOC did not act on the Charge within six (6) months of its filing, Davidson filed the instant Complaint against Weyerhaeuser, alleging age and gender discrimination with regard to his September 2009 termination [Doc. 1].

161. On May 12, 2011, the EEOC issued a Notice of Right to Sue regarding Davidson's ADEA claims [Doc. 25-5]

## **Law and Analysis**

The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any

individual or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a).  To establish an ADEA claim, "[a] plaintiff must prove by a preponderance of the

evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the

challenged employer decision." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922-23 (5th Cir.

2010) (citing *Gross v. FBL Fin. Servs., Inc.*, ___U.S. ____, 129 S.Ct. 2343, 2351 (2009)).

　　　　When, as here, the plaintiff relies on circumstantial evidence to establish his ADEA

claim, the court analyzes the sufficiency of the evidence under the framework established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).  *Jackson v. Cal-W.*

*Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010).  Under this framework,

> [a] plaintiff relying on circumstantial evidence must put forth a prima facie case,
> at which point the burden shifts to the employer to provide a legitimate, non-
> discriminatory reason for the employment decision.  If the employer articulates a
> legitimate, non-discriminatory reason for the employment decision, the plaintiff
> must then be afforded an opportunity to rebut the employer's purported
> explanation, to show that the reason given is merely pretextual.

*Moss, supra* (internal citations and quotation marks omitted).

　　　　To establish a prima facie case of age discrimination, plaintiff must adduce evidence that

"(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected

class at the time of discharge; and (4) he was either i) replaced by someone outside the protected

class, ii) replaced by someone younger, or iii) otherwise discharged because of his age."

*Jackson, supra* (citation omitted).

　　　　Here, Weyerhaeuser does not contest that plaintiff meets the first three elements of his

prima facie case.  (MSJ Memo., pg. 23)  Rather, defendant contends that plaintiff does not

satisfy the fourth requirement of his prima facie case, as defined by a line of Fifth Circuit

decisions that limits the fourth element to "evidence, either circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching its decision." *Id.* (citing *inter alia*, *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir. 1996)).

The court finds that the prima facie standard as defined in *Jackson, supra* merely serves as a more expansive restatement of the prima facie burden set forth in *Woodhouse, supra*.  In any event, this issue does not materially affect the ultimate outcome in this case.  *See discussion, infra*.  Accordingly, the court will adopt the more generous prima facie definition as set forth in *Jackson, supra*.  Under that standard, it is manifest that Davidson satisfies the fourth element of his prima facie case because his duties were assumed by someone younger than himself.

Thus, at this point, the pendulum of production swings towards Weyerhaeuser to articulate a legitimate non-discriminatory reason for its employment decision.  In this regard, the uncontroverted summary judgment record establishes that Weyerhaeuser let Davidson go because it needed to make reductions in the human resources area, and because of his supervisor's concerns regarding his "ability to handle the administrative, tactical, day-to-day work at the Dodson facility that was required in this new HR organization."  Two critical factors that guided the selection process as to who would be let go were geography and the overall performance reviews by the two leaders involved in the decision, *i.e.*, Adams and Roth. Furthermore, the predominant factor behind Weyerhaeuser's decision to retain Benefield and Leatherwood over Davidson was the support of the mill managers that each worked with.

The court finds that the foregoing rationale constitutes a legitimate, non-discriminatory reason sufficient to support Weyerhaeuser's decision to eliminate plaintiff's position.  *See Cherry*

24

*v. CCA Properties of Am., Ltd. Liab. Corp.*, 438 F. App'x 348, 352 (5th Cir. 2011) (unpubl.) (reduction in force is a legitimate, non-discriminatory reason for termination) (citation omitted); *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 356–57 (5th Cir.2007) (reorganization of department, which resulted in the elimination of plaintiff's position, constitutes a legitimate, non-discriminatory reason for termination).  Thus, the critical issue becomes whether plaintiff has presented a genuine issue of material fact as to whether Weyerhaeuser's proffered explanation for its decision was, instead, mere pretext for unlawful discrimination.  *Jackson, supra*.

   "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Jackson*, 602 F.3d at 378-79 (citations and internal quotation marks omitted).  Plaintiff also may demonstrate pretext by adducing evidence that he was "clearly better qualified **(as opposed to merely better or as qualified**) than the employees who are selected . . ." *Moss*, 610 F.3d at 922 (citation and internal quotation marks omitted) (emphasis added).  Nonetheless, to show that he was "clearly better qualified" than another retained employee, plaintiff must present evidence sufficient for the trier of fact to conclude that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id*. (citation and internal quotation marks omitted).  Furthermore, "unless the qualifications are so widely disparate that no reasonable employer would have made the same decision, any differences in qualifications are generally not probative evidence of discrimination." *Id*. (internal quotation marks and citations omitted).

   Davidson contends that he clearly was better qualified than the two other Louisiana human resources managers retained by Weyerhaeuser – Billy Benefield and Dawn Leatherwood.

Certainly, there is no question that Davidson obtained more advanced educational degrees than Benefield or Leatherwood.  Furthermore, as argued by Davidson, he had more experience at higher level positions than Benefield or Leatherwood.  However, greater work experience alone does not suffice to raise a fact issue as to whether an individual is clearly more qualified than another.  *Moss, supra* (citations omitted).  Moreover, it was precisely Davidson's experience at the regional human resources level that made him less attractive for the position of human resources manager *at the facility level*.

Plaintiff argues that he was disadvantaged and penalized because of his prior work experience at the regional level.  Unfortunately, plaintiff is correct.  However, that does not suggest, let alone demonstrate, that plaintiff's discharge was motivated by age.  Plaintiff's discharge was the culmination of two prior reductions-in-force that resulted in his transfer to a facility human resources manager position in the Lumber unit.

The court observes that plaintiff makes no creditable argument to challenge the legitimacy of the 2008 realignment that resulted in the elimination of several regional human resources positions and his reduction to the position of human resources manager at the facility level.  In fact, the two other area manager positions were eliminated, and the incumbents left the company.  Cheryl Adams assumed the role of these consolidated positions.  If Weyerhaeuser's motivation was to rid itself of Davidson because of his age (and salary), it could have terminated his employment at that point.  Instead, Weyerhaeuser endeavored to preserve plaintiff's employment by moving him to a lower level position at the facility level.

Perhaps plaintiff's best argument in this case stems from the May 2009 decision by Adams and Roth to transfer Davidson from Adams' purview within the EWP unit to Roth's

oversight in the Lumber unit.  Plaintiff argues that Benefield should have been transferred rather than he.  He emphasizes that Benefield suffered from a black mark in his record because he once used an un-validated test to screen employees.  Adams was aware of this issue.  However, she felt that Benefield was a strong performer.  Moreover, Adams could not transfer Benefield to another division because he did not have a good reputation outside of the facilities that he actually supported.  She, on the other hand, strongly felt that Benefield could be rehabilitated.  Accordingly, she sought to transfer Davidson instead.

Defendant contends that because Roth was the same person who accepted Davidson's transfer to her division, and also the same person who discharged him a few months later, there is a presumption that her latter decision was not motivated by unlawful animus.  *See Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) (discussing "same actor inference").  Plaintiff contends that the same actor inference is inapplicable because J.R. Roth did not make the decision to transfer Davidson to her division.  Rather, the decision to transfer Davidson was made by others, and, in any event, Davidson was inherited.

Plaintiff is only partially right.  He is correct insofar as he argues that Roth was not the person who selected him as a candidate for transfer.  Instead, that decision was made by Adams.  On the other hand, there is no evidence that Roth was required to accept Davidson to fill her vacancy.  Prior to the transfer, Roth was made aware of some questions surrounding Davidson's ability and/or willingness to perform at the facility level.  However, she accepted his transfer.  Plaintiff has not pointed to any evidence to demonstrate that Roth had no choice in the matter.  Thus, nominally at least, Roth brought Davidson on board to her division, and then selected him for discharge a few months later.  However, because of the interwoven nature of the decision-

27

making process that also included Janice Adams and Cheryl Bourn, the same actor inference

remains weak, at best, and does not influence the outcome in this case.[20]

     More importantly, however, is that there is no evidence that Adams and Roth knew at the

time of Davidson's transfer in May 2009 that they were going to need to further reduce their

human resources manager numbers just a few months later.  In other words, there is no evidence

that the transfer served as some intermediate step in a grand scheme to set Davidson up to fail.

In fact, Davidson considered Adams, Roth, and Bourn to be fair persons.  Apparently, as far as

Adams and Roth knew, following the transfer, Davidson would have the time to hone his skills at

the tactical level, and to foster vital relationships with the mill managers and facility workers.

     As it turns out, however, that is not what happened.  Just a few months after his transfer,

Adams, Roth, and Bourn were required to further reduce their numbers.  They considered other

options that entailed retaining Davidson in anticipation of future growth.  In the end, however,

they decided that they needed to eliminate one position in the Louisiana-Arkansas area where

they were overstaffed.  Based upon plant manager feedback, Davidson was the natural choice.

     All of the plant managers polled preferred Leatherwood and/or Benefield over Davidson.

Several of the plant managers harbored rather unflattering impressions of Davidson.  When or

how the plant managers developed these opinions is not particularly relevant, so long as they

were not based on a protected characteristic – in this case, age.  Although Davidson did not agree

with Adams and Roth's practice of soliciting opinions about him from others, he conceded that it

---

[20]  If Roth indeed was free to reject Davidson's transfer, the record does not reflect what
would have transpired had she exercised that option.  If Adams was not willing to transfer
Leatherwood out of her division, and unable to transfer Benefield, then her only option would
have been to discharge Davidson in May 2009.

was beneficial for a facility human resources manager to have a good relationship with the mill manager.

As set forth in the recitation of uncontested facts, it is manifest that, for a variety of reasons, the mill managers in Louisiana did not care for Davidson.  In brief, plaintiff tries in vain to undermine the reliability of some of those opinions.  For instance, he argues that Steve Story and Debbie Tadlock only interacted with him in his capacity as a regional manager.  However, the import of Story and Tadlock's opinions is not necessarily so much as what they had to say about Davidson, but that they strongly preferred Benefield.[21]

Of course, one mill manager who had secondhand experience with Davidson's handling of a reduction-in-force at the Dodson facility was Kathy Willoughby.  Her maintenance manager advised her that it was his impression that Davidson had little or no experience handling such a task, and appeared to be having difficulty finding requisite information for the selection process. (Willoughby Decl., Def. Exh. 11).  Accordingly, Willoughby borrowed Dawn Leatherwood who started the analysis from scratch and completed the task in just a few hours.  *Id*.  It was Willoughby's impression that Davidson appeared to be more accustomed to higher-level work, while letting others handle more mundane, day-to-day tasks.  *Id*.

In an effort to deflect the efficacy of this poor report concerning his handling of the Dodson reduction-in-force, plaintiff stresses that he had been "perfectly capable" of handling a closure at the Taylor facility, without any such issues.  This argument, however, overlooks the feedback from the Taylor mill manager, Ben Freelon, who told Roth that several hourly

---

[21]  Even if, as plaintiff contends, Steve Story was beholden to Benefield because of Story's own performance plan, this, in and of itself, does not reflect unlawful animus.  Moreover, contrary to Davidson's impression, Dawn Leatherwood investigated Steve Story, not Benefield.

associates affected by the closure did not "appreciate" how Davidson had worked with them on their benefits information.  (Roth Depo., pgs. 18, 29-30).  Moreover, Freelon was not the only person who questioned Davidson's support for the hourly associates – so did Janice Alexander and Dawn Leatherwood.

Furthermore, many of the mill/plant managers had the impression that Davidson did not have the heart for the nitty-gritty, front line work in the trenches.  They thought that he would prefer the more hands-off role of a regional manager.  And they were correct.  Although plaintiff accepted his reassignment to a facility-level position he admitted that he did not like it. (Davidson Depo., pg. 165).  He wanted to be a regional manager.  *Id*.

In spite of the plant/mill managers' uniformly unfavorable opinions of Davidson at the facility level, Davidson returns to the refrain that his superior education, greater experience, and high performance reviews demonstrate that he was clearly better qualified than Benefield and Leatherwood.  Davidson, however, has not demonstrated that a graduate or even a college degree were needed to successfully perform the plant/mill level human resources manager position.  In fact, Davidson promoted Dawn Leatherwood to the human resources manager position, and then proceeded to assign her high marks for her work.  Moreover, if Leatherwood was able to succeed at her position despite her lack of a college degree, then clearly Benefield's degree more than qualified him for the position.  Furthermore, Benefield had worked as a human resources manager in a mill/plant setting longer than Davidson had.  Also, Benefield's tenure at Weyerhaeuser was longer than Davidson's.

Davidson emphasizes the fact that he trained Benefield and Leatherwood.  That fact, however, does not necessarily advance his cause.  It just as equally establishes that Benefield and

30

Leatherwood surpassed Davidson in their ability to serve as plant/mill human resources managers.

Davidson also touts his annual peformance scores.  However, at least some of them covered the period when he was still a regional manager, rather than after his 2008 reassignment to a facility human resources manager.  Moreover, Davidson's total, composite score was negligibly higher than Benefield's tally.  In fact, Benefield scored higher in most, if not, all of the practical skills scores.

In sum, plaintiff clearly believed that he was superior to his former subordinates, Benefield and Leatherwood.  However, the area plant/mill managers did not share Davidson's opinion of his own abilities to add value at the facility level.  Plaintiff puts forth various reasons why the plant/mill managers did not want him as a human resources manager at their facilities. None of these reasons, however, stem from his age.  Because plaintiff was working from the assumption that he was better than his former subordinates, he naturally concluded that the decision to discharge him must have arisen from unlawful animus – if not because of his gender, then because of his age.  However, the instant summary judgment record provides ample, un-rebutted evidence to refute plaintiff's assumption, and that supports Weyerhaeuser's decision to discharge plaintiff.  As the Fifth Circuit has repeatedly emphasized,

> [t]he ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions nor was it intended to transform the courts into personnel managers. The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.

*Moss, supra* (citing *Bienkowski v. Am. Airlines, Inc.,* 851 F.2d 1503, 1507-08 (5th Cir.1988)).

In this case, although plaintiff's counsel has admirably endeavored to create a genuine issue of material fact as to pretext, the court is compelled to find that, based on the existing

31

summary judgment record as argued by the parties, no reasonable juror could return a verdict in favor of plaintiff.  Stated differently, the existing evidence would not suffice to withstand a directed verdict in favor of defendant.

For the foregoing reasons, the court finds that there is no genuine dispute as to any material fact, and that movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.

Accordingly, the motion for summary judgment [doc. # 57] filed by defendant Weyerhaeuser NR Company (incorrectly named in the complaint as "Weyerhaeuser Corporation") is hereby GRANTED.  Judgment shall issue dismissing with prejudice plaintiff's claims, in their entirety, at plaintiff's cost.

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 12th day of October 2012.

Karen L. Hayes
U.S. Magistrate Judge